## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GOR INVESTMENT LIMITED** | ) | |
| Suite V3 Langdale House | ) | |
| 11 Marshalsea Road | ) | |
| London SE1 1EN | ) | |
| United Kingdom | ) | Civil Action No. 1:25-cv-4506-EGS |
| | ) | |
| and | ) | **Jury Trial Demanded** |
| | ) | |
| **OVIK MKRTCHYAN** | ) | |
| Suite V3 Langdale House | ) | |
| 11 Marshalsea Road | ) | |
| London SE1 1EN | ) | |
| United Kingdom | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **STRAIFE, LLC** | ) | |
| 633 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20004 | ) | |
| | ) | |
| **JOSEPH PATRICK FLEMING** | ) | |
| 633 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20004 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **STEPHEN PRENTISS PAYNE** | ) | |
| 633 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20004 | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 1

PARTIES .................................................................................................................... 5

JURISDICTION AND VENUE ................................................................................... 6

FACTS ...................................................................................................................... 16

    A.   Ovik Mkrtchyan and Gor ............................................................................ 16

    B.   Shadmanov's campaign of extortion and retaliation .................................... 16

    C.   Shadmanov orchestrates Mkrtchyan's unlawful detention in Uzbekistan ...... 17

    D.   Mkrtchyan's trusted business associates partner with Shadmanov to turn against him ... 18

        1.   Joseph Fleming and Straife ................................................................ 19

        2.   Stephen Payne .................................................................................... 22

        3.   Fleming and Straife turn against Mkrtchyan and Gor .......................... 23

        4.   Payne turns against Mkrtchyan and Gor ............................................ 28

        5.   Defendants wrongfully publicize their allegations further .................... 31

        6.   Fleming and Straife begin the payoff to Payne .................................... 36

    E.   Defendants knew that their defamatory statements against Mkrtchyan were false when they made them or acted with reckless disregard as to their truth ................................. 37

    F.   Defendants hid the Straife letter/report and Payne's letter, tolling the statute of limitations under the discovery rule and doctrine of fraudulent concealment ................................. 40

    G.   Mkrtchyan and Gor suffer over $1 billion in losses proximately caused by Defendants' wrongful actions ................................................................................ 47

CAUSES OF ACTION .............................................................................................. 54

PRAYER FOR RELIEF ............................................................................................ 59

Plaintiffs Ovik Mkrtchyan and Gor Investment Limited (collectively, "Plaintiffs") hereby bring this First Amended Complaint ("FAC" or "Complaint") against Defendants Straife, LLC, Joseph Patrick Fleming, and Stephen Prentiss Payne (collectively, "Defendants"). In support thereof, Plaintiffs allege the following:

## NATURE OF ACTION

1.      This case arises from an ongoing campaign against Plaintiff Ovik Mkrtchyan and his company, Co-Plaintiff Gor Investment Limited ("Gor"). The campaign was initiated by a wealthy Uzbek cement businessman, non-party Ulugbek Shadmanov, his company, non-party United Cement Group ("UCG"), and a group that Shadmanov leads. Shadmanov and UCG recruited Defendants into the campaign, enticing them with financial gain in exchange for the wrongful actions outlined in this Complaint, even though Defendants had previously worked with Plaintiffs for many years. The result has been over $1 billion in damages to Mkrtchyan and Gor for which Defendants are responsible.

2.      In 2023, non-party Shadmanov and his group asked Mkrtchyan to use his U.S. relationships to help Shadmanov put certain Uzbek citizens on the U.S. sanctions list (and thereby prompt their prosecution in Uzbekistan), or else Shadmanov and his team would destroy Mkrtchyan's businesses and livelihood. When Mkrtchyan rightly refused this request, in January 2024, he was wrongfully arrested on false charges at the behest of Shadmanov and his group. Mkrtchyan was detained for three months in Uzbekistan under miserable conditions before being cleared and released in April 2024. But this relief quickly proved to be temporary, as Defendants engaged in further conduct that compounded the harm to Mkrtchyan and Gor.

3.      Since 2022, Defendants Straife, LLC and its CEO Joseph Fleming had worked on behalf of Mkrtchyan and Gor. Gor was a trusting client, paying Straife and Fleming more than $100,000 for confidential strategic and risk advice on some of Plaintiffs' most sensitive matters.

Straife and Fleming later advised on Mkrtchyan's wrongful detention in early 2024. But by the time Straife concluded its relationship with Gor, Defendants saw an opportunity to profit from their familiarity with Mkrtchyan and Gor by working for the very parties who had engineered Mkrtchyan's detention. They offered their services to Shadmanov and UCG, were formally retained by them, and worked on their behalf to strip Mkrtchyan and Gor of contracts, projects, and opportunities worth well over $1 billion. Among other things, Fleming and Straife secretly wrote an unsigned "report" supposedly cataloging misconduct by Mkrtchyan and one of his business associates, and in August 2024, used a law firm in Indiana to transmit that report (without identifying Fleming and Straife as the authors) to Uzbekistan's Ambassador in Washington and ultimately the President of Uzbekistan—all with the aim of interfering with Plaintiffs' contractual relationships and damaging their reputations.

4.     Defendant Payne was likewise driven by money to turn against Plaintiffs. Payne, a registered lobbyist and foreign agent who claims many Washington ties, had worked with Mkrtchyan and his companies since around 2016 and had introduced Mkrtchyan to Fleming and Straife. During Mkrtchyan's wrongful detention in Uzbekistan in early 2024, Payne wrote a letter of support seeking his release. But Payne has also spent the better part of the last two decades in deep debt as a result of several sizable judgments and failed business ventures. When Fleming and Straife offered him a chance to work for Shadmanov against Mkrtchyan, Payne stood to make far more than he had working with Mkrtchyan. At Fleming's and Straife's direction, Payne also sent a letter to Uzbekistan's Ambassador in Washington in August 2024, retracting his prior letter of support for Mkrtchyan and smearing Mkrtchyan as a criminal. At the very same time, Payne and Fleming began striking lucrative lobbying and consulting deals that would reward Payne for helping to destroy Plaintiffs' business for Shadmanov's benefit.

5.      In sum, Defendants devised a covert smear-and-interference campaign directed at Washington and Tashkent (Uzbekistan's capital) that was designed to manipulate and mislead Uzbekistan's Ambassador and Embassy in Washington using false and defamatory information to interfere with Mkrtchyan's and Gor's contracts and to damage their reputations. Acting as paid agents of Shadmanov and UCG, Straife and Fleming secretly drafted their unsigned report that used false and defamatory allegations to malign Mkrtchyan and his business associate; arranged for a third-party lawyer to transmit that unsigned report under a different letterhead to the Uzbek Ambassador in Washington and ultimately the President of Uzbekistan; directed Payne to send a parallel false and defamatory letter to the Ambassador in Washington and ultimately the President, repeating and amplifying the same falsehoods (and compensated Payne for doing so); repeatedly followed up with the Ambassador in Washington to ensure their messages had maximum impact; and did all of this while concealing their own involvement and disguising their role as the authors of the defamatory statements and promoters of the smear campaign.

6.      The aim of this campaign was not simply to damage Plaintiffs' reputations in the abstract. Its purpose and effect were to interfere with Plaintiffs' existing and prospective contracts, to halt performance of major projects, and ultimately to destroy those contracts and projects in order to punish Mkrtchyan and Gor. Throughout many years of working with Plaintiffs, Defendants knew that the success of Plaintiffs' business ventures in Uzbekistan relied on maintaining a positive reputation with Uzbekistan's Ambassador and Embassy in Washington, and the broader Uzbek government they represented. Defendants knew that falsely accusing Mkrtchyan of serious crimes and misconduct would damage that reputation and cause the significant economic harm to Plaintiffs outlined in this Complaint.

7.    Defendants therefore set out to convince the Uzbek Ambassador in Washington that Plaintiffs and their associates were criminals; to undermine Plaintiffs' standing with foreign government officials and U.S. business contacts in Washington; and to chill and divert ongoing and planned high-value projects and contracts in Uzbekistan, about which Defendants also knew through their longstanding relationships with Mkrtchyan and Gor. The losses caused by this conspiracy are measured in excess of a billion dollars.

8.    The campaign reflected the second phase of a broader effort orchestrated by Shadmanov and his group: first, to have Mkrtchyan detained by the Uzbek security services; and then, after Mkrtchyan's detention failed to elicit a false confession from him, to ruin his reputation and business. Defendants willingly participated in that second phase after quickly switching sides from the first. They knew from their own prior work for Plaintiffs, and from Payne's earlier letter supporting Mkrtchyan's release, that the accusations they were pushing were false. Yet they chose to adopt those accusations as their own, cast them as "investigative findings" or concerns, and deliver them to senior foreign government officials and decision-makers in Washington and elsewhere.

9.    Defendants did so with knowing or reckless disregard for the truth. Payne reversed himself without any basis within weeks of supporting Mkrtchyan, abandoning his prior written representation that Mkrtchyan had been unfairly targeted by Shadmanov and his group, and instead promoting Shadmanov's false storyline in exchange for compensation. Fleming and Straife ignored information confirming that their accusations were false; made up accusations on their own while pretending they came from trusted third-party sources and analyses; accepted fees from the party whose misconduct they had observed up close; and anonymized their "report" and sent their accusations through intermediaries to avoid detection and accountability. Defendants

deliberately sought to trade Plaintiffs' reputation and contracts for their own financial gain and for the benefit of the person who had orchestrated Mkrtchyan's detention, and their conduct gives rise to claims for tortious interference with existing and prospective contracts, defamation, injurious falsehood, and civil conspiracy.

10.    Defendants' false and defamatory statements to the Uzbek Ambassador in Washington and their subsequent conduct, including their role in the further publication of those same falsehoods by paid "media" outlets, had Defendants' and Shadmanov's intended effect: they caused Mkrtchyan's and Gor's existing contracts to be terminated and prevented their performance, cut off business expectancies, and damaged Mkrtchyan's reputation with Uzbekistan's government, and later, with the broader international business community on which Mkrtchyan and Gor rely for their success.

11.    Although the Indiana-based law firm that Straife and Fleming used to send their secret report recently issued an unqualified retraction and apology to the Ambassador, the President, and Mkrtchyan, the damage from Defendants' conduct has been done, and Defendants persist in their wrongful actions today.

**PARTIES**

12.    **Plaintiff Ovik Mkrtchyan.** Plaintiff Ovik Mkrtchyan is a natural person, citizen of Armenia and Cyprus, and legal resident of Latvia. Mkrtchyan is the founder and shareholder of Plaintiff Gor Investment Limited.

13.    **Plaintiff Gor Investment Limited ("Gor").** Plaintiff Gor Investment Limited is a company organized and existing under the laws of England and Wales with its principal place of business at Suite V3 Langdale House, 11 Marshalsea Road, London SE1 1EN, United Kingdom.

14.    **Defendant Straife, LLC ("Straife").** Defendant Straife, LLC is a Texas limited liability company that claims to have its principal place of business at 1250 Wood Branch Park Drive No. 410, Houston, Texas 77079. Straife also maintains an office in the District of Columbia at 633 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

15.    **Defendant Joseph Fleming.** Defendant Joseph Fleming is a natural person and U.S. citizen who is the co-founder, CEO, and 100% owner of Defendant Straife. On information and belief, Fleming is a citizen and resident of Texas.

16.    **Defendant Stephen Payne.** Defendant Stephen Payne is a natural person. Payne is a citizen and resident of Texas.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and complete diversity exists because Plaintiffs are citizens or subjects of foreign states, and Defendants are citizens of one or more U.S. states.

18.    The Court has personal jurisdiction over all Defendants. The exercise of personal jurisdiction over each Defendant comports with due process because each Defendant has sufficient minimum contacts with the District of Columbia, Plaintiffs' claims arise out of or relate to those contacts, the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice, and the exercise of jurisdiction is permitted under the District's long-arm statute. As outlined in this Complaint, Defendants purposefully availed themselves of the privilege of conducting activities within the District, thus invoking the benefits and protections of its laws, and Defendants could reasonably anticipate being called into a court in the District.

19.    In particular, this Court has personal jurisdiction over all Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because all Defendants would be subject to jurisdiction

in the District under D.C. Code § 13-423(a), which states that "[a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." Moreover, and in the alternative, this Court may exercise jurisdiction because Defendants "transact[ed] … business in the District of Columbia." *See* D.C. Code § 13-423(a)(1).

20.     All Defendants have caused tortious injury in the District of Columbia by acts or omissions outside the District that are outlined in this Complaint—including, but not limited to, drafting, approving, sending, and publishing false, defamatory, and disparaging statements about Plaintiffs to recipients in the District for the specific purpose and with the reasonably foreseeable effect of causing tortious injury to Plaintiffs in the District.

21.     Among other things, Defendants Straife and Fleming directed and caused the transmission of an unsigned "investigative" report they prepared, and an accompanying letter they organized and requested, to the Uzbek Ambassador in the District after writing the report for this specific purpose and with the intent that the Ambassador act on the report and cover letter; Defendants Straife, Fleming, and Payne caused Defendant Payne's August 2024 letter to be prepared and transmitted to the Uzbek Ambassador in the District with the intent that he act on that letter; Defendants Straife, Fleming, and Payne engaged in and caused others to engage in numerous follow-up calls and emails with the Ambassador in the District to ensure that their messages achieved maximum damage to Plaintiffs while requesting the Ambassador's assistance to transmit them to other stakeholders in Uzbekistan's government and to keep them confidential

7

(thereby helping Defendants conceal them from Plaintiffs); Defendants Straife, Fleming, and Payne targeted Plaintiffs' relationships and reputations with foreign government officials and institutions in the District, including the Uzbek Ambassador and Embassy; and Defendants Straife, Fleming, and Payne caused paid content, blog posts, and articles to be published in the District that ostensibly corroborate their false and defamatory claims, with the intent that the Ambassador and his staff read and act upon them and thereby regard the letters and report as more credible.

22.    By transmitting the letters, report, and follow-up communications to the Uzbek Ambassador in the District, Defendants Straife, Fleming, and Payne knowingly and intentionally injured Gor's and Mkrtchyan's reputation with the Ambassador and Embassy in the District. Defendants' transmittal of the letters, report, and follow-up communications, and the Ambassador's receipt of them in the District, was the original event and first effect of the Defendants' tortious conduct that led to Plaintiffs' injuries. Those injuries include Gor and Mkrtchyan's expenditure of over $1 million in the District to mitigate and address the false and defamatory claims Defendants directed at the District; breaches, terminations, suspensions, and failures of performance of Plaintiffs' contracts; harm to Plaintiffs' business expectancies and relationships; reputational harms; loss of contracts, projects, investment opportunities, lost profits, and other pecuniary losses; among other injuries in the District and elsewhere identified in this Complaint.

23.    In addition, Defendants also regularly do or solicit business, engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed, or services rendered, in the District of Columbia as required under the long-arm statute.

24.     Defendant Straife maintains an office in the District of Columbia at 633 Pennsylvania Avenue, N.W., Washington, D.C. 20004, and has maintained an office in the District since at least August 2021.

25.     Straife's marketing materials present it as having expertise representing clients in dealings with federal agencies, including those in national defense and security, congressional and legislative representatives, and foreign embassies, including those in the District.

26.     Many senior members of Straife's team, including approximately one-third of its managing directors, advertise the District as their location on Straife's website and have a Straife business address in the District. This includes Craig Lebamoff (Managing Director), Jason Fuller (Managing Director, Global Development), Kenneth Merten (Managing Director), Stephen Guice (Vice President, Strategic Communications), and Robert Wilson (Geopolitical Analyst). Lebamoff also claims on social media to be "Living in DC." Fleming acknowledges that Straife performs work on behalf of paying clients in the District and derives revenue from work in the District.

27.     Straife and its employees post social media updates describing Straife's lobbying, solicitation of business, and other work in the District, including photographs in connection with client meetings, promotional events, and other business there, in an effort to showcase their regular presence, track record and ability to conduct business in the District on behalf of their clients. Its senior employees and representatives tout their ongoing work engaging U.S. agencies and foreign embassies in Washington on behalf of their clients. Straife representatives, including Fleming, Lebamoff, Fuller, and others, each regularly attend several dozen meetings and events per year in Washington, D.C. with and on behalf of clients, over the course of multiple visits per year to the District. These activities in the District, consisting of multiple visits per year for substantial business engagements, are not sporadic, but persistent and regular. At times, these meetings with

and on behalf of clients are documented on social media, such as this LinkedIn post showing three

Straife representatives who have a material connection to the events at issue in this lawsuit – Jim

Conway (Straife Managing Director), Fleming, and Fuller – in Washington at the end of a

"[a]nother great week" there in 2025:



https://www.linkedin.com/posts/activity-7293692396511367168-kpnm/ (Feb. 7, 2025).

28.    Examples of other posts by Fuller in the year before this lawsuit was filed describe:

- "Washington, D.C. … Coupla [sic] days of meetings on the Hill, *Embassy Row*, Foggy Bottom … *Marathon of meetings for Straife and Hyperfocal Communications clients*, buckle up!"

- "[J]ampacked *48 hours in Washington, DC with Straife and Hyperfocal Communications client meetings on the Hill and administration, holiday parties, political fundraisers and talking 2026 World Cup* with #FIFA President"

- "*Great few days for Straife and our clients last week in Washington, DC*" including "a few visits to friends at *various embassies*"

- "*[G]reat week in Washington*, DC ... Highlights include **numerous meetings and receptions on and off the Hill with Straife and Hyperfocal Communications clients**, various **programs at think tanks**..."

- "Quick **36 hours in Washington, DC for Straife and Hyperfocal Communications client meetings** and the **'Golden Age' party on the rooftop** of the Department of Interior, complete with **#MAGA beer**, and **after-party at the Waldorf**, of course!"

- "A **great week in Washington,** DC with **Straife and Hyperfocal Communications client meetings**."

**Exhibit 8**, Sample Social Media Posts (emphasis added).

29.     For these and other reasons outlined in this Complaint, Straife therefore regularly does or solicits business, engages in persistent courses of conduct, and derives substantial revenue from services rendered in the District.

30.     Defendant Fleming is the co-founder, CEO, and 100% owner of Straife, which he formed in early 2020. For years, Fleming has served as a D.C. lobbyist, with lobbying disclosures dating back to 2019 that provide examples of his regular meetings and travels to the District on behalf of clients. *See, e.g.*, Linden Government Solutions' Supplemental Foreign Agents Registration Act ("FARA") Statement dated December 30, 2019. More recently, Fleming regularly engages U.S. and foreign government officials in the District on behalf of his clients, attends meetings in the District with and on behalf of clients, works for and solicits business from clients in the District, and maintains a business office in the District at Straife's location there. Fleming's activities in the District consist of multiple visits per year, and sometimes multiple visits per month, for substantial business engagements; his business activities in the District are not sporadic, but persistent and regular.

31.     He also derives substantial revenue from his own work in support of Straife's footprint in the District. As noted above, Fleming acknowledges that Straife, of which he is the

100% owner, performs work on behalf of paying clients in D.C. and derives revenue from work in D.C.; consequently, he derives revenue from services rendered in D.C. Similarly, Fleming derives revenue from his own work in support of Hyperfocal Communications, LLC ("Hyperfocal"), a company of which Straife (and thus Fleming) owns 49% and that has an office in the District, services clients in the District, and solicits business in the District. Moreover, according to a press release by Team Eagle LLC describing a $1.5 million lobbying contract it signed in 2024, Fleming also serves as a member of the leadership of Team Eagle, a self-described business development and advocacy firm headquartered in the District. As also described below, in 2024, Team Eagle awarded and paid a $900,000 subcontract to Hyperfocal for services that were primarily rendered in the District at what Hyperfocal described as its primary business address, with Fleming deriving substantial revenue from this work through his 49% ownership in Hyperfocal—of which a Straife managing director (Fuller) is also CEO. Fleming also derives substantial revenue from other services rendered in the District, including through his personal relationships with clients and U.S. and foreign government decision-makers there.

32.    For these and all other reasons outlined in this Complaint, Fleming thus regularly does or solicits business, engages in persistent courses of conduct, and derives substantial revenue from services rendered in the District.

33.    Defendant Payne concedes the Court has personal jurisdiction over him. Payne bills himself as a lobbyist and consultant with an extraordinary breadth of contacts in the District that he regularly uses on behalf of his clients. He regularly travels to the District to lobby and meet with U.S. and foreign government officials there on behalf of clients and has done so for decades. Payne has also founded and is the 100% owner of several companies through which he lobbies and meets with U.S. and foreign officials in the District on behalf of clients, including Linden

Strategies, Linden Government Affairs, Worldwide Strategic Partners, Team Eagle Consulting, and others. He markets his services to clients using photos of himself with U.S. officials in the District, and touts his experience working in the George W. Bush White House and serving on a variety of District boards and committees as a basis for his ability to influence U.S. and foreign government officials there. He also markets his experience providing governmental affairs representation to clients in the District. Payne's numerous filings under the Lobbying Disclosure Act ("LDA") and FARA show that he earns substantial revenue from providing lobbying and other services in the District. These filings are replete with entries for in-person meetings in the District that Payne attended to lobby or work on behalf of clients, as well as phone calls he had with government officials and other individuals in the District for the same purpose. *See, e.g.*, Linden Government Solutions' Supplemental FARA Statement dated December 30, 2019; LGS LLC's Supplemental FARA Statement dated August 28, 2024. Payne also maintains an office in the District. In recent FARA filings he made with the Department of Justice under penalty of perjury, Payne confirmed that his "primary business address" is at 633 Pennsylvania Ave, N.W. in Washington—at Straife's office. *See, e.g.*, Stephen Payne's Supplemental FARA Statement dated October 19, 2024. For these and all other reasons outlined in this Complaint, Payne thus regularly does or solicits business, engages in persistent courses of conduct, and derives substantial revenue from services rendered in the District of Columbia.

34.     In addition to the long-arm statute at D.C. Code § 13-423(a), the Court can also exercise personal jurisdiction over Payne under D.C. Code § 13-422 because he maintains his principal place of business in the District. On October 19, 2024, Payne filed a sworn statement with the Department of Justice asserting that his primary business address is in the District, and he has since reaffirmed that statement.

35.     This Court also has personal jurisdiction because of Defendants' continuous and systematic contacts with the District. The exercise of personal jurisdiction over all Defendants is consistent with due process guarantees. All Defendants have minimum contacts with the District, such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice, and this suit arises out of those contacts. All Defendants have established these contacts by purposefully availing themselves of the privilege of conducting activities within the District, including but not limited to the business activities and tortious conduct set forth in this Complaint, thus invoking the benefits and protections of its laws.

36.     Defendants Straife, Fleming, and Payne have also established minimum contacts by intending to harm and in fact harming Plaintiffs' reputation in the District by directing and causing the transmission of the letters and report to the Uzbek Ambassador and Embassy in the District and engaging in follow-up calls and emails to the District in order to maximize the impact of the letters and report. Defendants did so intending to harm Plaintiffs, knowing and intending that the Ambassador would receive, read, and act on the letters, report, and follow-up communications and share their content with others in Uzbekistan's government. By directing and causing the transmission of the letters, report, and follow-up communications to the Ambassador and Embassy in the District as outlined in this Complaint, Defendants Straife, Fleming, and Payne expressly aimed their intentional acts at the District and caused harm to the Plaintiffs in the District.

37.     Defendants Straife, Fleming, and Payne each intended and knew that the brunt of that harm would be suffered by Mkrtchyan and Gor in the District because that is where the Uzbek Ambassador was likely to (and in fact did) receive, read, act on, and share the information in the letters and report, and where Plaintiffs' reputation would be harmed—and in fact was harmed. Defendants expressly aimed their conduct at the District, strategically choosing to send their

defamatory letters and report to the Ambassador and Embassy—rather than only to the President—because they knew from their extensive experience with Uzbekistan's government that their communications would have a greater impact if sent to the District.

38.    Jurisdiction in the District also comports with fair play and substantial justice. The burden on all Defendants is minimal and proportionate because of their significant business activities in the District and because Defendants themselves directed the letters, report and follow-up communications into the District. The District has an interest in the dispute because the letters, report, and follow-up communications were deliberately sent into the District to cause harm to Plaintiffs, including in the District. The District satisfies an interest in obtaining convenient and effective relief because the letters, report, and follow-up communications were sent to the District and thus the effects of the tortious conduct were first felt there.

39.    These activities justify a conclusion that all Defendants could reasonably anticipate being called into a court in the District.

40.    Moreover, after a reasonable opportunity for further investigation and jurisdictional discovery, additional evidence will likely show that Straife and Fleming each regularly do and solicit business (including through meetings and visits multiple times per year and sometimes multiple times per month), engage in persistent courses of conduct, and derive substantial revenues (including at least hundreds of thousands of dollars per year) from services rendered in the District; that Straife and Fleming possess the minimum contacts required for specific jurisdiction under each of the claims at issue in this case, and that the exercise of jurisdiction here will not offend notions of fair play and substantial justice.

41.    Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

**FACTS**

### A.  Ovik Mkrtchyan and Gor

42.    Ovik Mkrtchyan is an entrepreneur and innovator at the helm of multiple businesses. Mkrtchyan was born in Armenia and raised in Uzbekistan, and he now resides in Europe. After earning several university degrees, Mkrtchyan spent the last 30 years developing expertise in business, finance, and investments. Mkrtchyan's businesses—primarily located in the United Kingdom, Switzerland, Uzbekistan, and Latvia—focus on innovation, sustainability, and technology.

43.    Gor was founded in 1999, with offices in London and Tashkent, and significant business relationships in the U.S.

44.    Gor's projects include initiatives to combat infection in medical patients, to process and dispose of hazardous waste, to harness gas metallurgy technology for the production of nano powders of rare and precious metals, and to train young engineers in Uzbekistan.

45.    Gor's advisory board reflects the company's global reach and technological prowess and has included former U.S. Secretary of State Mike Pompeo, former U.S. Secretary of Energy and Governor of Texas Rick Perry, and former director of the Oak Ridge National Laboratory Dr. Thomas Zacharia.

### B.  Shadmanov's campaign of extortion and retaliation

46.    For more than two years, Mkrtchyan has been the victim of an extortion campaign against him and his interests, spearheaded by Uzbek businessman Ulugbek Shadmanov.

47.    Shadmanov is the principal shareholder of UCG, the largest cement producer in Central Asia.

48.    In 2023, through an individual acting on his behalf, Shadmanov demanded that Mkrtchyan use his connections in the United States to put certain Uzbek citizens on the U.S.

sanctions list in order to prompt prosecution of those individuals in Uzbekistan. Shadmanov's team provided Mkrtchyan with the personal information of the targeted individuals, including passport and itinerary information. Shadmanov's team warned Mkrtchyan that if he failed to satisfy Shadmanov's demands, his business projects in Uzbekistan would be shut down.

49.    Mkrtchyan refused to comply with the unlawful demands of Shadmanov and his group.

50.    Shadmanov then embarked on a campaign of retaliation against Mkrtchyan and his companies.

**C. Shadmanov orchestrates Mkrtchyan's unlawful detention in Uzbekistan**

51.    In January 2024, Shadmanov and his group of associates orchestrated Mkrtchyan's wrongful detention in Uzbekistan.

52.    Mkrtchyan and his daughter were detained by officers of Uzbekistan's State Security Service.

53.    Mkrtchyan's daughter was released, but Mkrtchyan was held under harsh conditions in Uzbekistan for several months. Uzbek officials confined him to a small cell, repeatedly interrogated him, denied him access to medication and other necessities, and attempted unsuccessfully to extract money and false confessions from him.

54.    During his detention, Mkrtchyan's business associates, including members of the Gor advisory board and Payne, wrote letters of support on his behalf to the President of Uzbekistan, Shavkat Mirziyoyev, and Uzbekistan's Ambassador in Washington, D.C., Furqat Sidikov.

55.    For example, on April 10, 2024, Payne sent a letter of support to the President and Ambassador calling for Mkrtchyan's release, explaining that Mkrtchyan had been unfairly targeted by Shadmanov and UCG. **Exhibit 1**. That letter, dated April 10, 2024, included the following statements:

- "On January 17, 2024 upon their departure from the office in Tashkent, Mr. Ovik Mkrtchyan and his daughter were detained by the officers of the SGB (State Security Service)."

- "For the duration of his detainment from 17 January 2024 the officers of SGB were constantly pressing Mr. Ovik Mkrtchyan to admit guilt for crimes he did not commit."

- "Since Mr. Mkrtchyan did not admit any fictitious charges, the SGB personnel resorted to pressuring and forcing the relatives and acquaintances of Mr. Mkrtchyan to provide fictitious information that would incriminate him."

- "The true reason behind this issue is a conflict between Mr. Ovik Mkrtchyan on one hand, and" a group headed by "Shadmanov . . . on the other."

*Id.*

56.     Straife and Fleming, who had been serving as risk management consultants for Gor, also advised on and participated in work to secure Mkrtchyan's release from unlawful detention.

57.     Throughout his detention, Mkrtchyan refused to confess to crimes he had not committed. He ultimately was released on April 12, 2024. Official records confirm that he was cleared of all charges.

58.     Nonetheless, Shadmanov continued to press forward with his campaign against Mkrtchyan, including through efforts to manipulate some Uzbek government officials with false and defamatory information about Mkrtchyan and Gor.

59.     In mid-2024, Mkrtchyan learned that Shadmanov and his group were planning to have him arrested again. Mkrtchyan and his family were able to leave the country before he was rearrested. They have resided outside Uzbekistan since then due to the safety concerns caused by Defendants' conduct outlined in this Complaint.

**D. Mkrtchyan's trusted business associates partner with Shadmanov to turn against him**

60.     Unable to coerce Mkrtchyan with threats or imprisonment, Shadmanov targeted Mkrtchyan's businesses, including by interfering with Plaintiffs' contracts and ruining their

reputation through communications with the Uzbek Ambassador in Washington and false stories on the internet that would seemingly corroborate what those communications alleged.

61.     A central plank of this defamation campaign was to conspire with and turn Mkrtchyan's trusted business associates against him—including Payne, Fleming, and Straife.

**1.  Joseph Fleming and Straife**

62.     Fleming is the owner and CEO of Straife. Straife is a consulting firm that claims it "provides risk advisory and compliance services for governments and multinational organizations worldwide." Straife claims to have "[u]nparalleled expertise … draw[ing] upon decades of experience in military logistics, cross-border corporate M&A, law enforcement, and digital innovation." Straife also claims that its experts have significant experience in Central Asia, including in Uzbekistan.

63.     In November 2022, Straife and Gor entered into a consulting agreement that ran until early 2024. Under the agreement signed by Straife's CEO Fleming, Straife agreed to provide "consulting services … related to general compliance matters and business development matters, including due diligence *on certain potential acquisition and business partners for*" Gor in exchange for a $10,000 monthly fee. To facilitate Straife's and Fleming's performance of their consulting and risk management services, Gor provided Straife and Fleming with detailed information about its business projects and contracts in Uzbekistan and elsewhere, including the specific projects and contracts at issue in this Complaint. Jim Conway, a managing director and senior strategist at Straife who works closely with Fleming, also became a member of Gor's advisory board throughout the term of the consulting agreement.

64.     Before deciding whether or not to take on Mkrtchyan and Gor as clients, Straife conducted an extensive due diligence review of Mkrtchyan and his companies. This due diligence was led by Conway, a former FBI agent who claims expertise in complex, international

19

investigations. Straife itself is a company that markets its expertise in legal and compliance due diligence to clients, describing the quality of its due diligence as "comprehensive" and its risk management as involving "robust procedures for ongoing monitoring and continual assessment." *See* Straife's website, available at: https://straife.com/private-sector/corporate-strategy (last visited Mar. 12, 2026). Straife's comprehensive due diligence found nothing of concern about Mkrtchyan or his companies, and Straife agreed to work as a consultant for Gor.

65.    Straife and Fleming likewise found nothing of concern in any continued due diligence they conducted throughout their relationship with Mkrtchyan and his companies.

66.    Gor paid Straife over $100,000 for their services.

67.    Straife and Fleming received some of Gor's most confidential information, and Fleming personally worked on some of Gor's most sensitive and important matters.

68.    Straife and Fleming also received information about all of the contacts and projects at issue in this Complaint.  For example, in 2023, Fleming and Conway attended Gor advisory board meetings with Mkrtchyan in Uzbekistan where the then-existing projects and contracts with CITIC and anticipated projects and contracts with CC7 and BASF were discussed with them. Later that same year, Conway (Straife) and Defendant Payne attended Gor advisory board meetings with Mkrtchyan in Washington, D.C., where these projects—including then-existing CITIC contracts and upcoming contracts with CC7 and BASF—were also discussed with them. Conway took this information back to Straife and shared it with Fleming in order for them to advise Gor and Mkrtchyan as risk management consultants. Straife charged Gor for Fleming's and Conway's services and expenses in attending these meetings. Straife and Fleming later learned through information Gor provided for their risk consulting work that Gor was executing contracts with CC7 and BASF. Payne likewise learned about these contracts with CC7 and BASF through his

ongoing efforts to work with Mkrtchyan and his companies, and shared information about Gor's contracts with Straife and Fleming.

69.     Moreover, Straife, Fleming, and Payne were aware from the information presented at these meetings—and their broader expertise in Central Asia and Uzbekistan—that Gor's and Mkrtchyan's ability to execute these projects and contracts depended on maintaining their positive reputation with Uzbekistan's government, and particularly, its Ambassador and Embassy in Washington, D.C.

70.     Straife and Fleming subsequently worked on Mkrtchyan's unlawful detention in Uzbekistan beginning in January 2024. In the course of advising on Mkrtchyan's unlawful detention, and based on both their earlier due diligence and their examination of the claims against Mkrtchyan, Straife and Fleming agreed that Mkrtchyan had been wrongfully detained, had not committed any crime in Uzbekistan or elsewhere, and had done nothing wrong. At Fleming's direction, Straife representatives contacted the Ambassador in Washington while Mkrtchyan was detained, correctly portraying Mkrtchyan's detention as wrongful, baseless, and an attempt to steal and harm his and Gor's businesses, and arranging for third parties to contact the Ambassador in Washington as well.

71.     In January 2024, Straife and Fleming also voiced significant apprehension about misconduct by UCG and Shadmanov. Straife and Fleming raised concerns that UCG and Shadmanov intended to misappropriate Mkrtchyan's and Gor's assets by falsely alleging they had engaged in wrongdoing, and even recommended to associates of Mkrtchyan that a Member of Congress write a letter to the U.S. Office of Foreign Assets Control ("OFAC") requesting that it investigate UCG for sanctions violations. Given Fleming's professed expertise in risk management

and sanctions, his view that UCG's misconduct was so serious as to warrant a government investigation into sanctions violations was presumably well-informed and sincere.

### 2. Stephen Payne

72.     Stephen Payne presents himself as a successful lobbyist, consultant, and businessperson with successful ventures in overseas energy projects and numerous, high-level contacts in the District.

73.     But Payne has a history of unpaid debts and failed ventures, resulting in a line of sizable judgments against him from banks, noteholders, casinos, and business associates.[1] Mkrtchyan's and Gor's experience with Payne proved consistent with that history.

74.     Over the years and while unaware of Payne's troubles, Mkrtchyan or his companies worked with Payne on potential business ventures.

75.     As noted above, in April 2024, while Mkrtchyan was wrongfully imprisoned in Uzbekistan, Payne wrote a letter of support to President Mirziyoyev and the Uzbek Ambassador in Washington, attesting to Mkrtchyan's innocence and good standing, calling for his release, and expressly blaming Shadmanov for Mkrtchyan's wrongful detention. In his letter, Payne told President Mirziyoyev and Ambassador Sidikov that:

- Shadmanov orchestrated Mkrtchyan's wrongful arrest because "Mkrtchyan did not comply with a request made by Mr. Ulugbek Shadmanov," *i.e.*, to use his U.S. relationships "to assist in including two Uzbek nationals into the OFAC [sanctions] lists, and to commence their criminal prosecution."

---

[1] *See, e.g.*, No. 2009-73282, *Suzer Group v. Payne et al.*, 189th District Court of Harris County; No. 2009-69050, *Central Bank v. Payne et al.*, 61st District Court of Harris County; No. 2010-46995, *MGM Grand Hotel, LLC v. Payne*, 281st District Court of Harris County; No. 13-cv-2332, *Marsoft v. Payne et al.*, U.S. District Court, Southern District of Texas.; *John Speer & Withers Energy Group, L.P. v. Payne et al.*, 165th District Court of Harris County; No. 955559, *First Victoria Nat'l Bank v. Payne*, Harris County Civil Court at Law No. 4; No. 23-CCR-236089, *State of Texas v. Payne*, Fort Bend County Court at Law No. 3.

- After refusing this request, Mkrtchyan's "projects started stalling and were basically put on hold," and Mkrtchyan was told that "Shadmanov will personally destroy them."

- Shadmanov was "attempting to employ channels to destroy high government officials of the Republic of Uzbekistan, by contacting foreign institutions that have an ability to provide sanctions pressure…."

**Exhibit 1**.

76.    In this same timeframe, Payne separately expressed his belief that UCG and Shadmanov should be investigated for sanctions violations themselves and personally brought these matters to the attention of a Member of Congress and OFAC.

77.    Even after Mkrtchyan's release on April 12, 2024, Payne continued to express concerns to Uzbekistan's government about Mkrtchyan's treatment and Shadmanov's efforts to harm him and his business interests, writing to the Uzbek Ambassador in Washington and to the Uzbek President to complain about Shadmanov's conduct. On April 22, 2024, Payne wrote another letter to the Uzbek Ambassador and President, stating that the same government officials who had detained Mkrtchyan "likely … were colluding with Mr. Shadmanov, and now cannot forfeit their plans to destroy Mr. Mkrtchyan."

### 3. Fleming and Straife turn against Mkrtchyan and Gor

78.    As stated above, Mkrtchyan was released on April 12, 2024.

79.    By that time, Straife's and Fleming's relationship with Gor had ended. Straife and Fleming had recommended a course of action to obtain Mkrtchyan's release, which Gor refused to approve or undertake out of concerns about its legality. Gor, Straife, and Fleming therefore parted ways.

80.    Apparently unhappy about this outcome, Fleming and Straife agreed to help UCG and its owner Shadmanov interfere with Mkrtchyan's and Gor's existing and prospective contracts, derail major projects, and ultimately destroy those opportunities to punish Mkrtchyan and Gor.

Fleming and Straife did so through a smear-and-interference campaign that covertly spread false and defamatory information about Mkrtchyan and Gor to Uzbekistan's Embassy and Ambassador in D.C., and from there, to the country's head of state and other government officials.

81.    On information and belief, Fleming and Straife were first connected to Shadmanov through an intermediary.

82.    Fleming and Straife were formally retained by UCG to represent it and Shadmanov in this effort, and were paid for their efforts. On information and belief, when making payments in connection with their campaign, Shadmanov and UCG used cryptocurrency and other hard-to-trace methods in an apparent effort to conceal the payments and the sources of funds.

83.    Among other things, Straife and Fleming prepared a purported investigatory report titled "Report on the Nefarious Activities of Uktam Aripov." **Exhibit 2.**[2] This "report" was a six-page document, accompanied by an assortment of exhibits, about Uktam Aripov, a business associate of Mkrtchyan. It was deliberately unsigned with no reference to its author, in order to conceal Straife's and Fleming's role.

84.    The report made false and defamatory claims about Mkrtchyan and his business, including that Mkrtchyan allegedly has ties to Russian organized crime, has engaged in extortion and "corrupt activities," and is "involved" in an "extortion and smear campaign against numerous Uzbekistan citizens," and the report attempted to smear and discredit Mkrtchyan further by making numerous false allegations about Aripov. In an apparent effort to further harm Mkrtchyan, the "report" also attempted to discredit several prominent Uzbek officials and included claims relating to well-known U.S. citizens, including members of Gor's advisory board.

---

[2] Plaintiffs have placed a watermark on certain exhibits to warn that they contain false information. The watermark does not appear in the original copy.

85.    Among other things, the report falsely stated that Mkrtchyan "has active ties to Russian organized criminal organizations . . . and has been detained and released twice in Uzbekistan in connection with his corrupt activities." The report made that statement even though Fleming and Straife were aware—and had agreed—during their work for Mkrtchyan and Gor only months earlier that Mkrtchyan had no such ties and was an innocent man wrongfully detained in Uzbekistan.

86.    The report also falsely stated that Mkrtchyan made threats to Shadmanov. Fleming and Straife also knew from their own due diligence and work on Mkrtchyan's detention that this was untrue, and they had in fact agreed that it was the other way around, with Shadmanov threatening Mkrtchyan.

87.    The report also falsely stated that Mkrtchyan invokes the names of Gor's advisory board members "when attempting to blackmail people." This was also a false and defamatory allegation that Fleming and Straife knew was untrue based on their extensive, ongoing due diligence into Mkrtchyan and Gor, and their work on Mkrtchyan's release in which they had agreed that it was in fact Shadmanov, not Mkrtchyan, who was attempting to blackmail people.

88.    To further discredit Mkrtchyan by association using false allegations, the report also claimed that Aripov, whom it described as a "key business partner" of Mkrtchyan, "engaged in a bribery and smear campaign" and "launched an effort to smear and destroy Ulugbek Shadmanov, the shareholder of United Cement Group," when Straife and Fleming knew that it was Shadmanov who engaged in this conduct against Mkrtchyan. The report also falsely stated that Aripov made false statements to a Member of Congress about sanctions violations by Shadmanov, when it was Fleming who in January 2024 had accused UCG of violating U.S. sanctions and recommended informing a Member of Congress about this violation.

89.    The report falsely stated or implied that Mkrtchyan was responsible for or endorsed all of the alleged conduct by Aripov described in the report, or that this conduct was undertaken as part of a conspiracy in which Mkrtchyan was allegedly involved.

90.    The report's false and defamatory statements were also made of and concerning Gor. The report made a point of tying Gor to the false and defamatory allegations about Mkrtchyan, describing Mkrtchyan as the head of Gor and falsely alleging that Mkrtchyan "often invokes th[e] names [of two of Gor's advisory board members] when attempting to blackmail people."

91.    The report's appendices included letters to President Mirziyoyev and Ambassador Sidikov about Mkrtchyan's prior detention that had been written by Gor and people associated with Gor. On information and belief, Fleming and Straife had obtained these letters through their work for Gor.

92.    Based on their extensive knowledge of and experience with Mkrtchyan and Gor—including their extensive due diligence of Mkrtchyan and Gor and their own acknowledgment that Mkrtchyan had never engaged in unlawful conduct and was being wrongfully detained in Uzbekistan—Straife and Fleming knew the report they prepared was false or at minimum acted with reckless disregard for the falsity of its allegations.

93.    Straife and Fleming also knew the allegations in the report were fabricated because they simply made them up while pretending they came from third-party "sources" or even "linguistic analysis."

94.    Straife and Fleming also never approached Mkrtchyan or Gor to inquire about the false statements in the report. This failure is especially striking in light of significant prior business relations between Straife and Gor, which Straife only embarked on after completing extensive due diligence about Mkrtchyan and Gor and finding nothing of concern.

95.    Moreover, Straife and Fleming were also aware of the obvious unseemliness of switching sides to help the principal antagonists of their client in matters on which they worked.

96.    For all of these reasons, Straife and Fleming therefore concealed their role in preparing the report from Mkrtchyan and Gor.

97.    On August 2, 2024, Craig Lebamoff, a managing director of Straife whose website states that he is based in Washington, D.C., introduced Fleming and Fuller (another Straife managing director) to former Ambassador Stephen Akard, a partner at the Indiana-based law and public affairs firm Bose McKinney & Evans LLP.   In particular, Lebamoff emailed Akard, Fleming, and Fuller, telling Akard: "Straife represents the client I mentioned: a concrete and materials company in the 'stans.  They would like to employ your legal expertise and diplomatic experience (and the resources of Bose McKinney) to assist their client," which was UCG.  Straife and Fleming sought to have Akard transmit Straife's "investigatory report" to Uzbekistan's Ambassador in Washington and the country's President in order to hide the fact that Straife and Fleming had prepared the report and to lend more credibility to its allegations.

98.    Straife and Fleming selected Ambassador Akard for this role because of his connections to Uzbekistan's Ambassador Sidikov in Washington and ability to contact him directly there.

99.    Straife and Fleming worked with a senior UCG officer to prepare Akard's letter, with only modest input from Akard's firm.

100.    On August 16, 2024, Akard, acting at the direction of Straife, Fleming, and UCG, sent that letter to President Mirziyoyev and Ambassador Sidikov. The letter claimed that UCG had "engaged a preeminent U.S. corporate investigatory firm, comprised of former U.S. law enforcement and intelligence community experts," to document certain "unfounded allegations"

about UCG and Shadmanov. The letter endorsed the contents of the report, stating that details of the purported campaign against UCG and Shadmanov and supporting documentation were provided in the report. Akard offered to provide more information to the Ambassador. He did not mention Straife by name in his letter.

101.    At Fleming's, Straife's, and UCG's direction, Akard emailed the letter to Ambassador Sidikov in Washington at both his official Embassy email address and his personal address, bcc'ing UCG and Fleming on the message. Akard followed up over several days to confirm that the Ambassador received the letter and would act on it.

102.    Akard and Bose McKinney acted as agents of Fleming and Straife in sending the letter and report at their direction, bcc'ing Fleming on their communications with the Ambassador, and forwarding to Fleming follow-up communications with the Ambassador in which the Ambassador confirmed—while in D.C.—that he received the letter and would act on it.

**4.    Payne turns against Mkrtchyan and Gor**

103.    In parallel, Fleming approached Payne and convinced him to abandon Mkrtchyan. Shadmanov and UCG had not only promised Fleming a significant sum of money for helping them to interfere with Mkrtchyan's and Gor's contracts and destroy their business, but they also assured Fleming that their efforts would result in Mkrtchyan being jailed for the rest of his life. Fleming likewise gave these assurances to Payne to convince him to participate in the conspiracy, while also agreeing to pay him a substantial sum for his participation.

104.    That sum was necessary in part because, for the scheme to have the greatest chance of success, it would require Payne to be critical of his own work and relationship with Mkrtchyan and Gor, to tolerate public criticism of that relationship and allegations regarding his purported work with them, and to look the other way as his name was used to make false accusations about Mkrtchyan and Gor.

105.    At Fleming's and UCG's direction, on August 23, 2024, Payne secretly wrote to President Mirziyoyev and Ambassador Sidikov again, this time expressly retracting the claims in his April 10, 2024 letter and his support for Mkrtchyan. Instead, Payne now accused Mkrtchyan of crimes and ties to Russian organized crime. **Exhibit 3**. Payne sent this letter to Ambassador Sidikov in Washington at Sidikov's Embassy and personal email addresses, and called him separately in Washington to ensure the letter would achieve its maximum harmful impact to Mkrtchyan.

106.    Payne worked with Fleming the week of August 23, 2024, to draft his retraction letter, and acted at the direction of Fleming and Straife in sending it. Payne's retraction letter coincided with Akard's transmission of his letter and the Straife report to the Uzbek Ambassador in Washington, D.C.

107.    The false and defamatory content of Payne's retraction letter also echoes allegations in the Straife report. For example, Payne's retraction letter claimed that Mkrtchyan has "ties to Russian organized crime"; that he had used his American ties to "threaten and extort various Uzbek businessmen"; that he had engaged in "unethical behavior"; that Mkrtchyan participated in a conspiracy to hide his ties to organized crime; and that his "trusted advisor" had sought to "create conflict" in the Uzbek President's family and "destabilize the highest levels of the Uzbek government."

108.    And similar to the Straife report, Payne's letter also sought to damage Mkrtchyan through association by making false and defamatory allegations against Aripov, falsely claiming that Mkrtchyan was in a conspiracy with him to engage in the above-referenced conduct, and stating or implying that Mkrtchyan was responsible for or endorsed all of Aripov's alleged conduct.

109.    Payne's false and defamatory statements were also of and concerning Gor. After withdrawing his prior claims about "Mkrtchyan and his investment company, Gor" and detailing the false and defamatory statements about Mkrtchyan, Payne falsely stated that he "will encourage Secretary Pompeo and Secretary Perry to step aside from their current roles at Gor." Payne thus implied that the alleged misconduct he identified should be attributed to Gor as well, and that others associated with Gor should end their associations because of this alleged misconduct.

110.    Payne then engaged in repeated email correspondence and other communications with the Uzbek Ambassador in Washington, D.C. regarding the false statements in his retraction letter. Payne bcc'd Fleming on this email correspondence.

111.    Like Fleming, Payne also concealed his role in sending this false and defamatory letter to the Ambassador and President. Payne's August 23, 2024 email transmitting the letter to Ambassador Sidikov requested that he treat the letter as confidential, and his letter, which was deliberately undated, requested the same.

112.    When Payne learned the next day that someone he viewed as closely associated with Mkrtchyan might have learned of the letter's existence, he quickly contacted Fleming and Ambassador Sidikov in Washington. Payne and Fleming agreed that Payne would make several contacts with the Ambassador in Washington in an effort to maintain the letter's secrecy and negative impact on Mkrtchyan. Payne acted on that agreement: Payne called the Ambassador early on a Saturday morning in an attempt to continue maximizing the letter's damaging impact on Mkrtchyan while scrambling to prevent Mkrtchyan from learning of its contents. Payne then sent the Ambassador another letter by email in the days that followed to try to keep his earlier letter concealed while bcc'ing Fleming on his follow-up letter to the Ambassador.

113.    Payne acted as an agent and coconspirator of Fleming and Straife in sending his letter to the Ambassador and Embassy.  Fleming and Straife directed Payne to send the letter, specified to Payne and his staff what it should say, and agreed that he would send it. Payne provided a copy of the letter to Fleming and Straife at the time it was sent, and then bcc'd them on subsequent communications with the Ambassador in which Payne sought to confirm that the Ambassador received it and would act on it and in which Payne attempted to conceal the letter from Mkrtchyan and maximize its impact. The Ambassador in fact received and acted on the letter while in the District.

**5.  Defendants wrongfully publicize their allegations further**

114.    Defendants' misconduct did not stop with their August 2024 letters to the Uzbek Ambassador and President.

115.    To give further credibility to those letters and amplify their impact, Defendants also conspired among themselves and with UCG and Shadmanov to cause purported "articles," blog posts, and other paid content containing false and disparaging information about Mkrtchyan to appear online.

116.    The purported articles, blog posts, and other paid content arranged by Defendants in coordination with UCG and Shadmanov were designed to make allegations consistent with the false and defamatory letters in order to amplify their content and lend them credibility. The purpose was to have those articles, blog posts and other content read in Washington, D.C. by the Uzbek Ambassador and his staff at the Embassy so that they would cause Uzbekistan's government to take further negative action against Gor's and Mkrtchyan's contracts and business relationships, including those outlined in this Complaint.

117.    For example, on or about October 19, 2024, the *London Post* published a purported article on its website titled "Corruption Networks of Uzbekistan: From Washington to Tashkent."

118.    Notwithstanding that its name suggests that it is a newspaper or news media entity, the *London Post* is not a reputable journalistic outlet in England. Rather, it is owned by the head of Moscow Media Group and posts a wide range of content, much of which appears to be the result of paid placements or derived directly from press releases or other public relations activities.

119.    The *London Post* "article," published weeks after the Payne letter and the Straife letter/report, makes a number of false and defamatory claims about Mkrtchyan and Gor that align with them, including:

- "Mkrtchyan, alongside key player [sic] like Uktam Aripov, has created a network of financial and political schemes that not only undermines Uzbekistan's sovereignty but keeps the country firmly within the grip of foreign manipulation."

- "Mkrtchyan and his partners have built connections with the U.S. political elite through firms like 'Linden Strategies,' managed by former White House insiders like Steve Payne. These aren't just casual meetings; this is a calculated web of influence designed to siphon money out of Uzbekistan while simultaneously propping up Western politicians. Even more troubling, figures like [a member of Gor's advisory board] are said to be tied to this scheme through Gorinvestment [sic]."

- "Gor Investment Limited [is] a firm linked to Ovik Mkrtchyan, notorious for his involvement in international corruption schemes."

**Exhibit 4**.

120.    Mkrtchyan has a pending lawsuit in England against the owners of the *London Post* for this content.

121.    As another example, on or about January 16, 2025, Radha Stirling, a public relations consultant, published similar content about Mkrtchyan, titled "US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding." The content falsely accuses Mkrtchyan of corruption and other criminal misdeeds and was published across several platforms under Stirling's control. Press reporting about Stirling and her work indicates that Shadmanov is one of her clients.

122.    Among other things, Stirling's article made false and defamatory statements, including:

- "Aripov's key business partner is Russian citizen and Oligarch, Ovik Mkrtchyan, the head of GOR Investments [sic] for which [certain individuals] are members of the advisory board. Mkrtchyan was detained in Uzbekistan in January 2024 on corruption related charges, reportedly having transferred more than a billion dollars to offshore accounts."[3]

- "Payne is a registered lobbyist for Aripov whose allies, [two Gor advisory board members], sit on the board of his client's business partner's (Oligarch Ovik Mkrtchyan) company who was arrested over corruption allegations. He has been accused of embezzling the company's wealth after appropriating Asia Alliance Bank … and establishing dozens of offshore companies."

- Mkrtchyan is allegedly part of a group of "Influential but corrupt people within Uzbekistan, who are close to the political opposition in the country, with links to Russian organized crime and a history of appropriating businesses [and] are targeting an investor for his business and assets."

- "Aripov's key business partner is Russian citizen and Oligarch, Ovik Mkrtchyan, the head of GOR Investments [sic] for which [two individuals] are members of the advisory board" and Mkrtchyan "reportedly ha[d] transferred more than a billion dollars to offshore accounts."

- "When we have people like Stephen Payne, [two members of Gor's advisory board], and [a Member of Congress named in the Straife report/letter] linked to oligarchs," which according to the article includes Mkrtchyan, "who are trying to steal control and assets by any means and to the extent they were willing to throw millions at Americans, you end up with individuals misusing their diplomatic powers for their own financial benefit . . . ."

**Exhibit 5**.

---

[3] Although Mkrtchyan was detained in January 2024 and released in April 2024, Stirling's article does not mention that he was cleared of all charges. Instead, Stirling's article conveys the defamatory implications that the detention arose from genuine, still-credible evidence against him; that the allegations in the article remain substantively unresolved or unsubstantiated rather than having been disproved or dismissed; and that Mkrtchyan's detention and the allegations against him are ongoing evidence of broader wrongdoing alleged in the article, rather than baseless claims from which he was exonerated.

123.    Mkrtchyan has a pending lawsuit outside the United States against Stirling for this content.

124.    Payne also provided false and defamatory information about Mkrtchyan, Gor, and Aripov to a reporter for the International Consortium of Investigative Journalists (ICIJ), which is headquartered in Washington, D.C., seeking to have the reporter publish false and defamatory claims about them that aligned with Payne's wrongful statements in his letter. Payne intended that Uzbekistan's Ambassador and his staff review these allegations in Washington and continue to credit the corresponding claims made in the Payne letter and the Straife letter/report. For example, on January 27, 2025, Payne provided the reporter with a photograph that he said proved his claim that Mkrtchyan was connected to organized crime by allegedly showing Mkrtchyan with a group of Russian mobsters, stating: "Another article from radio for Europe, US government-funded... In the group photo Ovik is the person to the far left... Obviously this is from a few years ago... The notorious Russian mobster is his godfather." **Exhibit 6.** But the individual in the photograph he identified is not Mkrtchyan, and Payne knew this or was reckless in not knowing it.

125.    On February 3, 2025, as Payne continued to provide false articles to the ICIJ reporter—including articles that Defendants either planted themselves or knew were planted by Shadmanov and UCG—the reporter responded: "Hey Steve. This looks like black PR to be honest," referring to a term in journalism for the practice of spreading false information through paid public relations disguised as news reporting. *Id.*

126.    Further confirming that Payne was working with Shadmanov, the reporter later asked him: "Steve, a question for when you have a moment: who does Shadmanov want revenge against exactly?" *Id.*

127.    To give further credibility to the claims made in the Payne letter and the Straife letter/report, Defendants also worked in Washington, D.C. with Shadmanov's and UCG's broader public relations contacts there. That included working with a major Washington-based public relations firm that earned nearly $400,000 for its work, and a convicted-felon-turned-lobbyist who was promised a $500,000 success fee to represent Shadmanov's interests there at the direction of the same senior officer of UCG who had worked with Fleming on the Straife letter/report. After a reasonable opportunity for further investigation and discovery, the evidence will likely show that Fleming and Straife, directly or through their agents, also had in-person meetings in the District, including with the public relations firm and lobbyist mentioned above, in an effort to disseminate the allegations in the letters and report further and maximize their impact with the Ambassador, Embassy, and the Uzbek government.

128.    In essence, Defendants created a self-reinforcing feedback loop, where the false and defamatory articles, blog posts, and paid content they worked with Shadmanov and UCG to plant would then serve as the source of a growing universe of further false and defamatory content that Defendants encouraged, knowing of its falsity or with reckless disregard for its truth. Defendants intended for these false and defamatory articles to be read by the Uzbek Ambassador and his staff in D.C., again to make the statements in their letters appear supported by a growing body of seemingly independent sources, in order to interfere with Plaintiffs' contracts and business relationships by having the Uzbek government stop or impede those transactions.

129.    After a reasonable opportunity for further investigation and discovery, the evidence will likely show that the Uzbek Ambassador and his staff in Washington, D.C. also reviewed and acted on these false and defamatory articles, which appeared to provide further support for the defamatory statements in Payne's letter and the Straife report, thereby increasing the damage

caused by the letters and report by seemingly corroborating their allegations and making them more difficult for Mkrtchyan and Gor to challenge.

### 6. Fleming and Straife begin the payoff to Payne

130.    On information and belief, part of Fleming's deal with Payne to turn against Mkrtchyan was to give him a piece of lucrative lobbying deals from Fleming's contacts.

131.    One such deal was with the Islamabad Policy Research Institute (IPRI), an organization with which Fleming was connected through his work "representing high-profile political clients such as the governments of Pakistan and Libya," as stated in his website bio. *See* Joe Fleming's biography, available at: https://straife.com/joseph-fleming (last visited Dec. 26, 2025).

132.    Less than a month after Payne sent his false and defamatory letter to Ambassador Sidikov and President Mirziyoyev, Payne formed a new Delaware limited liability company called Team Eagle Consulting, LLC ("Team Eagle") on September 18, 2024. This shell company, to which Payne contributed no capital on formation, was created to hold the lobbying contract through which Payne would receive his initial payoff. *See* Team Eagle's FARA Registration dated October 19, 2024. Moreover, Team Eagle's primary business address is Straife's office at 633 Pennsylvania Avenue N.W. in Washington, as confirmed by Payne's filings with the Department of Justice made under penalty of perjury to register under FARA. *See* Team Eagle's FARA Registration Statement dated October 19, 2024.

133.    Payne then signed a $1.5 million lobbying contract with IPRI—one of the largest lobbying contracts ever signed by that sovereign state or an affiliated entity—receiving his first wire transfer of $375,000 on October 9, 2024.

134.    But as disclosed in Payne's sworn FARA filings, Team Eagle subcontracted a large portion of that work to Hyperfocal Communications, LLC, of which Fleming owns 49% through

Straife. Team Eagle ultimately paid $900,000 to Hyperfocal while Payne kept $600,000 for himself (*see, e.g.*, Team Eagle's FARA Registration Statement dated October 19, 2024; Hyperfocal Communications, LLC's FARA Registration Statement dated October 22, 2024; and additional Team Eagle and Hyperfocal FARA filings). Hyperfocal describes Straife as its parent company (and Straife is 100% owned by Fleming), Hyperfocal's CEO (Jason Fuller) is also Straife's managing director of global development, and Hyperfocal's chairman is a senior advisor at Straife.

135.    Team Eagle subsequently issued an October 23, 2024 press release identifying Fleming as a member of its "leadership," even though he was not disclosed in FARA filings for this work.

136.    On information and belief, Payne and Fleming have entered into other transactions and contracts designed to mask and distribute payments from their work for Shadmanov and UCG.

### E.    Defendants knew that their defamatory statements against Mkrtchyan were false when they made them or acted with reckless disregard as to their truth

137.    Straife, Fleming, and Payne knew that their defamatory statements about Mkrtchyan were false at the time they were made or acted with reckless disregard as to whether they were true.

138.    Straife and Fleming knew that the defamatory statements contained in the Straife letter/report they authored were false. Straife and Fleming conducted extensive due diligence about Mkrtchyan and his companies before accepting him as a client, and Fleming professes particular expertise in due diligence. Neither in that due diligence nor in any continued diligence throughout their relationship did Straife and Fleming find anything of concern. And in the course of advising on Mkrtchyan's detention in Uzbekistan, Straife and Fleming agreed that Mkrtchyan had done nothing wrong and that Mkrtchyan was being unlawfully and wrongly detained.

139.    Only after their work for Gor ended did Straife and Fleming change course to make false statements about Mkrtchyan and Gor in exchange for payments from their new clients, Shadmanov and UCG. Straife's and Fleming's rapid about-face, in the context of everything they knew, further demonstrates that they knew their claims were false or acted with reckless disregard for the truth.

140.    Fleming and Straife invented disparaging statements about Mkrtchyan and Gor in the report at the behest of their new clients, Shadmanov and UCG. They also knew that the report falsely claimed that its information came from "sources" and "analysis," when the allegations were simply made up by Straife and Fleming, working with UCG and Shadmanov.

141.    Moreover, by simply adopting falsehoods created with Shadmanov and UCG, they failed to take steps to investigate their veracity. Fleming and Straife knew and agreed that UCG, Shadmanov, and his group had previously taken steps to harm Mkrtchyan, including by engineering Mkrtchyan's unlawful detention in Uzbekistan. Fleming and Straife themselves had expressed the view to Mkrtchyan in January 2024 that UCG and Shadmanov were planning to misappropriate Mkrtchyan and Gor's assets. That background should have prompted Fleming and Straife to take steps to determine whether statements made in collaboration with Shadmanov and UCG about Mkrtchyan and Gor were true. Yet Straife and Fleming either did not take any such steps, or they determined, after investigation, that the statements were false yet disseminated them anyway. Either way, Straife and Fleming's conduct shows a manifest disregard for the truth of the statements in their report.

142.    Moreover, rather than trying to corroborate the allegations in its report/letter with either Mkrtchyan or Gor, Straife, Fleming, and Payne went to great lengths to *conceal* from Mkrtchyan and Gor and falsely deny their involvement in fabricating the letters and report, as

outlined in this Complaint, further showing that they knew the statements were false or acted with reckless disregard for their truth.

143.    On October 29, 2025, the law firm and its attorney who sent the Straife letter/report sent a letter of unqualified retraction and apology to Ambassador Sidikov and President Mirziyoyev. The unreserved apology by a sizable U.S. law and public relations firm further confirms that Fleming and Straife knew that their claims were false and could not support them when pressed, even after repeated inquiries from that lawyer before he and his firm issued the retraction.

144.    In its retraction, the firm acknowledged that, "The letter and report were sent at the request of [its] now-former client United Cement Group," "The letter was prepared by UCG with modest input from [our] firm," and "the report was prepared for UCG by Straife," which "UCG had engaged." The firm went on to state:

> My firm and I did not separately verify the information in the letter and report, but relied on what UCG provided. We have no independent knowledge of the allegations and other statements in the letter and report, and we are not in a position to substantiate them. We further understand that Ovik Mkrtchyan maintains that the allegations of criminal conduct and other wrongdoing by him and people associated with him are false. We do not claim that these allegations are true or otherwise dispute Mr. Mkrtchyan's assertion. We did not previously work with UCG before sending the letter and report, and our relationship with them has terminated.

> After carefully reviewing this matter, my firm and I have determined that it would be appropriate to retract the letter and report. We hereby retract them in their entirety. We apologize if they caused any issues for you or any of the individuals or companies named in them.

**Exhibit 7**.

145.    Notwithstanding this recent retraction, the damage has been done and still continues.

146.    Payne also knew that the defamatory statements in the August 2024 letter he transmitted to the Uzbek Ambassador were false when he made them (as did Fleming and Straife

when they directed Payne to send this letter). Payne was a longtime business associate of Mkrtchyan and Gor. Payne had pushed for Mkrtchyan's release from unlawful detention in Uzbekistan in an April 2024 letter, and yet not only said the opposite, but expressly retracted that letter in his subsequent August 2024 letter. As shown by both the content of his April 2024 letter and his own knowledge of Mkrtchyan, Gor, and Aripov through years of working together, Payne had actual knowledge that his claims were false in sending the letter in August 2024.

147.    At a minimum, Payne acted with reckless disregard for the truth of the claims in his August 2024 letter. Despite the fact that the disparaging claims about Mkrtchyan and Gor in his August letter were diametrically opposed to statements he had made just months earlier in April 2024, Payne took no steps to verify any of those disparaging claims. When later pressed, neither Payne nor his staff could identify any of the purported "trusted sources" and "former US intelligence contacts" who supposedly provided information for his letter.

148.    In sum, Payne's August 2024 letter was not driven by a belief in the truth of any of the statements it contained. It was only at Shadmanov and his group's behest—with an opportunity to make millions with Fleming—that Payne decided to turn against Mkrtchyan, align himself with Shadmanov, and act in coordination with Fleming and Straife to make false statements about Mkrtchyan and Gor to the Uzbek Ambassador.

**F. Defendants hid the Straife letter/report and Payne's letter, tolling the statute of limitations under the discovery rule and doctrine of fraudulent concealment**

149.    Defendants concealed their scheme because they did not want Mkrtchyan and Gor to know that the Straife letter/report or Payne's letter had been sent to the Uzbek President and Ambassador, that those documents made false and defamatory statements, and that Defendants had any role in the related articles that were used to amplify these communications.

150.    Under the discovery rule, Defendants' conduct tolled the statute of limitations for Mkrtchyan's and Gor's causes of action, including defamation and injurious falsehood, because Mkrtchyan and Gor did not know and could not through reasonable diligence have discovered facts needed to assert the essential elements of those claims against Defendants. Defendants' concealment also tolled the statute of limitations for those claims under the doctrine of fraudulent concealment because Defendants employed affirmative acts to conceal the existence of the claims and facts forming their basis.

### 1.  Straife and Fleming

151.    First, the statute of limitations for Mkrtchyan's and Gor's causes of action for defamation and injurious falsehood against Straife and Fleming was tolled under the discovery rule until September 11, 2025, when Mkrtchyan and Gor first learned from a document production made by UCG's lawyer Akard that Straife and Fleming were the authors of the unsigned report. Moreover, Mkrtchyan and Gor did not even receive a copy of the unsigned letter/report until December 26, 2024, and until that time, they did not have confirmation that the letter/report actually existed or knowledge of the specific statements actually made in the letter/report, including false and defamatory statements alleging Mkrtchyan's involvement in organized crime and other wrongdoing. As such, Mkrtchyan and Gor did not know about their injuries before December 26, 2024, at the earliest. And because Mkrtchyan and Gor did not know that Straife and Fleming were the authors of the unsigned report until September 11, 2025—only that Akard had sent the letter/report—Mkrtchyan and Gor did not know that Straife and Fleming were the cause of their injuries from either the Straife letter/report or the articles that were used to amplify the Straife letter/report until that time. Nor did Mkrtchyan and Gor have sufficient evidence of Straife's and Fleming's wrongdoing or their involvement in the scheme at all until that time.

Moreover, in part because of Straife's and Fleming's active concealment of the letter/report, as set forth in more detail below, neither Mkrtchyan nor Gor could have discovered through reasonable diligence the facts needed for a claim against them.

152.    Second, the statute of limitations for Mkrtchyan's and Gor's claims against Straife and Fleming was also tolled under the doctrine of fraudulent concealment until September 11, 2025, because of Straife's and Fleming's affirmative acts to fraudulently conceal both the existence of the claims against them and the facts forming the basis of those claims. As outlined below, among other things:

- On or about August 2, 2024, Straife and Fleming—through a Straife employee or representative located in the District of Columbia who was acting at their direction (Lebamoff)—reached out to Akard and began making arrangements for Akard to act as a front for their report to the Uzbek President and Ambassador.

- Between August 2 and August 8, 2024, Straife and Fleming directed Akard to prepare a non-disclosure agreement that would hide Straife's involvement.

- On or about August 12, 2024, Fleming directed Akard to remove anyone from Straife from the cc line of an email in order to hide Straife's and Fleming's involvement.

- On or about August 13, 2024, Fleming directed Akard's firm to remove any mention of Straife from the non-disclosure agreement in order to hide Straife's and Fleming's involvement.

- Between August 2 and August 16, 2024, Straife and Fleming arranged to transmit the report to Akard via UCG in an effort to conceal their involvement should discovery ever be taken of Akard.

- On or before August 16, 2024, Straife and Fleming prepared the unsigned report—dubbed "Shadow Whisper Phase 1"—that purposefully concealed their authorship.

- On or about August 16, 2024, Fleming directed Akard to bcc Fleming on correspondence with the Uzbek Ambassador and President to hide their involvement.

- On or about September 27, 2024, Straife and Fleming directed Akard not to respond to any questions from Mkrtchyan's representatives about whether Akard had sent a letter, following vague rumors that Akard had sent such a letter.

- On December 18, 2024, Mkrtchyan's business associate Aripov asked Fleming in writing about what was then a rumor that in August 2024, Fleming was paid by Shadmanov to get

Payne to send a letter claiming he had made a mistake in sending his April 2024 letter, and also used a "lawyer [to] send [a] fully fake letter to Uzbekistan." Fleming falsely denied any involvement, responding in writing to Aripov that same day that: "I assure you, I have no interest in being involved in this situation" and "I have no idea. I did not and do not want to get involved."

- On or about January 14, 2025, Straife and Fleming again directed Akard not to respond to any questions from Mkrtchyan's representatives about whether Akard had sent a letter.

153.    Mkrtchyan and Gor had a longstanding business relationship with Straife and Fleming, believed Fleming's false representations about the report and letters, and expected Straife and Fleming to inform them about any involvement in the scheme with Shadmanov. But that is not what happened.

154.    Because of Straife's and Fleming's efforts to conceal the report and their preparation of it, and their subsequent work with Shadmanov and UCG to have articles published that would ostensibly corroborate the content of their report, neither Mkrtchyan nor Gor could have discovered through reasonable diligence the existence of their claims or facts needed to assert the essential elements of their claims until receiving the Straife letter/report and other documents from Akard on September 11, 2025.

**2.  Payne**

155.    First, the statute of limitations for Mkrtchyan's and Gor's causes of action, including for defamation and injurious falsehood, against Payne was tolled under the discovery rule until at least October 10, 2025, when Payne finally produced the letter and admitted that a copy of the letter Plaintiffs had received on December 26, 2024 was not a forgery.

156.    Before December 26, 2024, Mkrtchyan and Gor did not have the letter and had only heard a rumor that Payne had sent correspondence to the Uzbek President retracting his previous letter in support of Mkrtchyan. Neither Mkrtchyan nor Gor had seen the Payne letter before that time and as such did not have confirmation that the letter actually existed or knowledge of the

actual statements Payne made in the letter, including false and defamatory statements that echoed those in the Straife report and alleged among other things that Mkrtchyan has "ties to Russian organized crime"; that he used his American ties to "threaten and extort various Uzbek businessmen"; that he engaged in "unethical behavior"; that he participated in a conspiracy to hide his ties to organized crime; and that his "trusted advisor" had sought to "create conflict" in the Uzbek President's family and "destabilize the highest levels of the Uzbek government." Even so, Payne continued to assert the letter was a forgery until October 10, 2025.

157.    As such, neither Mkrtchyan nor Gor knew about their injuries until at least October 10, 2025. Likewise, because Mkrtchyan and Gor did not have the statements in the letter or confirmation that Payne had actually sent the letter—especially in light of Payne's denials that he had even made the statements—Mkrtchyan and Gor did not know of the cause in fact of their injuries or have sufficient evidence of Payne's wrongdoing, and did not have facts necessary to bring their claims against him, until at least October 10, 2025, when Payne finally admitted that the letter was not a forgery and produced a copy of it. Plaintiffs likewise did not know or have reason to know of Payne's involvement in any of the articles referenced in this Complaint until at least October 10, 2025. Moreover, in part because of Payne's active concealment of his statements, as set forth in more detail below, neither Mkrtchyan nor Gor should have discovered through reasonable diligence the facts needed for a claim against Payne either.

158.    Second, the statute of limitations for Mkrtchyan's and Gor's defamation and injurious falsehood claims against Payne was also tolled under the doctrine of fraudulent concealment until at least October 10, 2025, because of Payne's affirmative acts to fraudulently conceal both the existence of the claims against him and the facts forming the basis of those claims. As outlined below, among other things:

- Payne's August 23, 2024 email transmitting his letter to Ambassador Sidikov requested that the Ambassador keep Payne's letter "confidential" and "not share" it with anyone except the President and his inner circle. Payne's attached letter, which was deliberately undated, requested the same, saying he wished his statements to "remain internal and confidential."

- On August 24, 2024, after an initial exchange with Mkrtchyan's business associate Aripov, Payne quickly contacted Fleming and Ambassador Sidikov in Washington over a weekend, calling the Ambassador early on a Saturday morning in an attempt to continue maximizing the letter's damaging impact on Mkrtchyan while scrambling to prevent Mkrtchyan from learning of its contents and asking the Ambassador to ensure it remained confidential.

- On August 24, 2024, Payne refused to tell Aripov whether he had sent a letter to the Uzbek President retracting his previous letter in support of Mkrtchyan. On that date, Aripov sent Payne an email asking Payne whether it was true that he had sent a letter and expressing doubt that he had actually done so. Payne did not respond directly to the question and instead accused Aripov of acting against him.

- On August 27, 2024, Payne sent the Ambassador another letter by email (bcc'ing Fleming) reiterating his request that the letter be kept secret and complaining to the Ambassador about a "leak" of information in his office.

- On November 6, 2024, after Mkrtchyan's attorneys had contacted him, Payne admitted through his attorneys that he had in fact sent a letter, but falsely represented that the letter did not allege misconduct on the part of Mkrtchyan or anyone associated with him:

    > To clarify, Mr. Payne told the Uzbek government, Secretary Pompeo, and Secretary Perry that he was withdrawing from GOR Investment and ending his relationship with Mr. Mkrtchyan due to the fact that there were irreconcilable differences. **Mr. Payne did not mention other facts about Mr. Mkrtchyan or Mr. Aripov's involvement with third parties who are colorful persons of interest**.[4]

This representation was false, and Mkrtchyan and Gor only learned it was false after Payne finally admitted on October 10, 2025, that the copy Mkrtchyan and Gor had received on December 26, 2024, was not a forgery. Likewise, in that same communication of November 6, 2024, Payne, through his counsel, falsely "dispute[d]" that he made "false and disparaging" statements about Mkrtchyan. Additionally, Payne, through his counsel, falsely stated that "the only mention of [Secretary Pompeo's and Secretary Perry's] names in his dissociation with Mr. Mkrtchyan and GOR were in the context of telling the Uzbek government that he would be notifying Secretary Pompeo and Secretary Perry that he was no longer involved with Mr. Mkrtchyan and Gor." This too was knowingly false and

---

[4] Although Payne's attorney claimed Payne said he was "withdrawing from GOR Investment," Payne was not a shareholder in or part of Gor.

concealed Payne's claim that he would "inform [them] about the serious allegations and information [he] uncovered, and will encourage them to step aside."

- Even after Mkrtchyan and Gor received Payne's letter on December 26, 2024 and could review the false and defamatory statements, Payne continued to misrepresent the letter's authenticity and claim that he had not made these statements. On January 6, 2025, before Payne was aware that Mkrtchyan had received the letter on December 26, 2024, Payne claimed not to know of anything disparaging in the letter he sent and suggested that it might be "forged." He also continued to mischaracterize the letter's contents, telling Mkrtchyan's attorneys that he "would simply prefer to cease association with [Mkrtchyan] at this time as was outlined in my letter to the Uzbek government," thus further suggesting that whatever letter Mkrtchyan had received was not authentic. Indeed, Payne continued to suggest the letter might be a forgery and deny its contents until he finally produced a copy of the letter on October 10, 2025.

159.    Because of Payne's affirmative misrepresentations and other efforts to conceal the letter and its statements, as well as his involvement in the articles, some of which are referenced in this Complaint, neither Mkrtchyan nor Gor could have discovered through reasonable diligence the existence of their claims or facts needed to assert the essential elements of their claims, at the earliest, until at least October 10, 2025, when Payne finally confirmed the letter they first received on December 26, 2024 was authentic.

160.    As a result, under the District's discovery-rule accrual standard, Plaintiffs' causes of action for defamation and injurious falsehood arising from the Straife letter/report and Payne's letter did not accrue until, at the earliest, October 10, 2025 (for claims against Payne) and September 11, 2025 (for claims against Straife and Fleming), when Plaintiffs first obtained, or through reasonable diligence should have obtained, facts necessary to assert their defamation and injurious falsehood claims against Defendants. In any event, Defendants' affirmative acts of fraudulent concealment tolled the statute of limitations for these claims until those dates.

**G. Mkrtchyan and Gor suffer over $1 billion in losses proximately caused by Defendants' wrongful actions**

161.    Before Defendants' transmission of the Straife letter/report and the Payne letter, Mkrtchyan and Gor had sizable contracts and business relationships with companies operating in Uzbekistan, and significant business relationships with Uzbekistan's government.

162.    On June 21, 2021, Uzbekistan's President issued a presidential decree to direct the resources and cooperation of Uzbekistan's government toward Gor's and Mkrtchyan's projects, including but not limited to the following key projects:

- Production of high-quality synthetic lubricating oils, synthetic wax, and solvents;

- Production of protein preparations (*i.e.*, creating usable forms of proteins) and protein feed additives based on methanotrophic bacteria using natural gas;

- Production of genetically-engineered pharmaceuticals and other medicinal products through a newly-created biopharmaceutical complex;

- Creation of the Youth Center for inventive and creative technologies and elite engineering education (later known as the Center for Youth Initiatives); and

- Exploration and production of natural gas to ensure an uninterrupted supply of feedstock.

163.    Since then, Gor and Mkrtchyan have also pursued other projects with the Uzbek government's support, for example, in recycling (*e.g.*, processing and disposing of caprolactam production waste).

164.    Fleming and Straife knew about the June 21, 2021 decree and the key projects outlined therein because they were given this information in their work for Gor. Payne likewise learned of the decree and the projects it outlined through his work with Gor and his attendance at the Washington, D.C. meetings where these matters were discussed.

165.    Gor's and Mkrtchyan's businesses and their projects rely on cooperation with the Uzbek government and large international corporations. In particular, Gor's and Mkrtchyan's

businesses and their projects rely on a positive reputation with the government of Uzbekistan, including and through its Ambassador and Embassy in Washington, D.C. Payne, Straife and Fleming likewise were aware of this through their extensive work with Gor and Mkrtchyan and extensive experience with Uzbekistan.

166.    Prior to Defendants' actions in transmitting their letters and report to the Ambassador in August 2024, Gor and Mkrtchyan were known to the Ambassador and Embassy, had a positive reputation with them, and had previous contacts with the Ambassador and Embassy in the District.

167.    Gor's advisory board has included two former U.S. cabinet secretaries and continues today to include a former Secretary of State, in part because of the importance of Gor and Mkrtchyan's positive relationships and reputation in the District and the contacts with the Ambassador, Embassy, and others that maintain them.

168.    Straife, Fleming, and Payne were all aware of that positive reputation, of the importance of Gor and Mkrtchyan maintaining that reputation, and that providing false, negative information about Gor and Mkrtchyan to the Ambassador and Embassy would likely result in the termination of their contracts and business expectancies, and would otherwise harm them in the manner described in this Complaint.

169.    Indeed, Straife and Fleming previously contributed to Gor and Mkrtchyan's reputation with the Ambassador and Embassy by contacting them to provide information supportive of Mkrtchyan and Gor and requesting their help when Mkrtchyan was wrongfully detained. At Fleming's direction, Straife representatives contacted the Ambassador while Mkrtchyan was wrongfully detained, explaining what was happening to him as an effort to steal his and Gor's business. Fleming and Straife also arranged for a third party to contact the

Ambassador about Mkrtchyan during this time. Similarly, Payne previously wrote at least three letters of support to the Ambassador and Embassy regarding Mkrtchyan and Gor, and transmitted other letters of support to the Ambassador and Embassy. Straife and Fleming were aware of Payne's prior supportive letters: they attached them to their report and agreed with Payne that he would retract them and instead provide the Ambassador with false information about Mkrtchyan and Gor.

170.    In support of their business projects, Gor and Mkrtchyan signed contracts with established international companies such as BASF, China's state-owned investment company CITIC Group, and China National Chemical Engineering & Construction Corporation Seven Ltd. ("CC7").

171.    For example, in January 2024, Gor and Mkrtchyan signed a contract with BASF in connection with construction of an acetylene plant, to produce a valuable hydrocarbon with numerous industrial uses. Gor and Mkrtchyan signed several follow-on agreements with BASF and in furtherance of the project, including in February, April, and July 2024. Similarly, Gor and Mkrtchyan signed a contract with CC7 in July 2023, which was later followed by another contract with CC7 to produce petrochemicals, explore for and produce hydrocarbons, manufacture industrial reagents, build power facilities, and create other industrial and commercial products. And in 2022, Gor and Mkrtchyan signed a contract with CITIC to invest in a plant for production of synthetic wax and chemical substances from natural gas feedstock, and signed numerous subsequent contracts in furtherance of this project. CITIC also informed the President of Uzbekistan that it was ready to invest more than $1.5 billion in connection with this project.

172.    By the end of July 2024, Gor and Mkrtchyan had existing contracts with these companies and others, and Gor and Mkrtchyan reasonably expected to enter into additional

contracts with them and other companies to complete the five projects outlined in the presidential decree and additional projects. Indeed, as of July 29, 2024, Uzbekistan's government was still issuing written directives to state agencies to support Gor's projects and contracts.

173.    Defendants had actual knowledge of these existing and prospective contracts from information they received in their years of work with Mkrtchyan and Gor, and from information provided by Shadmanov, UCG, or their representatives. Defendants made their knowingly false and defamatory statements in the Straife letter/report and Payne's letter intending to interfere with these existing and expected contracts and thereby to damage Mkrtchyan and Gor's pecuniary interests. Defendants did so at the instruction or for the advantage of Shadmanov, who benefitted from this interference as part of his efforts to punish Mkrtchyan and Gor.

174.    The scheme worked as planned. After Defendants sent their false statements to Uzbekistan's Ambassador in August 2024, those statements were immediately circulated within the Uzbek government. Soon thereafter, certain government officials in Uzbekistan, including officials at the Ministry of Investments and Foreign Trade and the Ministry of Energy, acted upon the false statements and took actions to stop and prevent the performance of these existing and expected contracts with Mkrtchyan and Gor.

175.    For example, shortly after becoming aware of Defendants' false statements about Gor and Mkrtchyan and because of those statements, Uzbekistan's government expressly told CITIC, CC7, and BASF to cease working with Gor and Mkrtchyan.

176.    Shortly after becoming aware of Defendants' false statements and because of them, Uzbekistan's government also stopped providing necessary support to Gor's and Mkrtchyan's projects that had been promised and was occurring under the presidential decree, or to which Gor and Mkrtchyan were entitled to expect. The government's statements to counterparties about

ceasing business with Gor and Mkrtchyan and the government's withdrawal of its support based on Defendants' false statements caused counterparties to terminate existing contracts and projects, prevented the performance of existing contracts, and caused counterparties with which Gor and Mkrtchyan were to sign further contracts—including CITIC, CC7, and BASF—to refuse to sign contracts and to cease business with them in Uzbekistan. All of this proximately caused significant financial losses to Gor and Mkrtchyan.

177.    In late 2024, following the letter, report, and statements from the government, it became clear that CITIC, with which Plaintiffs were working on projects and contracts above, would no longer work with Gor and Mkrtchyan, and it declined to invest the more than $1.5 billion in the project. Similarly, in this same timeframe following the letter, report, and statements from the government, CC7, with which Gor and Mkrtchyan had signed the contracts above, abruptly ceased contact with Gor and Mkrtchyan. Likewise, in this same timeframe following the letter, report, and statements from the government, BASF halted work with Gor regarding the construction of an acetylene plant.

178.    Gor and Mkrtchyan had thus far invested substantial resources – at least $20 million – in the contracts and projects under the presidential decree, including the contracts with BASF, CC7, and CITIC at issue in this Complaint. Gor and Mkrtchyan had also secured the required capital for these projects and contracts and were ready, willing, and able to invest more in them, after which they reasonably expected to earn well over a billion dollars in profits on their investments in the contracts with BASF, CC7, and CITIC.

179.    Gor and Mkrtchyan's contracting partners' sudden refusals to deal with them directly followed and were proximately caused by Defendants' false and defamatory statements. Neither Gor nor Mkrtchyan had done anything that would have caused all of their contracting

partners in Uzbekistan to withdraw from these major business ventures at virtually the same time. Instead, their partners decided not to pursue business with Gor and Mkrtchyan based on the withdrawal of government support for these projects and the government's statements to them to cease working with Mkrtchyan and Gor—both of which were the direct, foreseeable, and intended result of Defendants' false and defamatory statements.

180.    Since Defendants' false and defamatory statements to Uzbekistan's Ambassador, and as a result of Mkrtchyan and Gor's damaged reputation with the Uzbek government, Gor and Mkrtchyan's former international partners have not been willing to enter into further agreements with Gor or Mkrtchyan concerning future projects or business ventures in Uzbekistan.

181.    But for Defendants' false and defamatory statements to Uzbekistan's Ambassador, it was reasonably probable and likely that Mkrtchyan's and Gor's existing contracts would not have been terminated, that their existing contracts could have been performed, that they would have been able to sign further contracts as identified in this Complaint, and that their economic losses would not have occurred. It was foreseeable to Defendants that their false and defamatory statements would interfere with Mkrtchyan's and Gor's existing and prospective contracts, and that was the result Defendants intended and caused here. Indeed, it was Defendants' intent to mislead, manipulate, and otherwise use Uzbekistan's government—through their communications to the Ambassador and Embassy in Washington—to do exactly what the government did in response.

182.    Due to Defendants' efforts to conceal their conduct, Mkrtchyan and Gor only later confirmed, on or after October 10, 2025 (for claims against Payne) and September 11, 2025 (for claims against Straife and Fleming), that their losses were caused by Defendants' false statements

sent to Uzbekistan's Ambassador and that the government's actions were undertaken because of the Straife letter/report and the Payne letter.

183.    By later in 2025, the content of the Straife report/letter and Payne's letter had begun to circulate in the broader international business community, doing even further damage to Mkrtchyan's and Gor's reputations and proximately causing further pecuniary loss.

184.    In addition to other losses described throughout this Complaint, from August 2024 to March 2026, Gor and Mkrtchyan have incurred over $2 million in crisis management and private security expenses in multiple jurisdictions that were necessary to attempt to mitigate the harms caused by Defendants' smear campaign, including the letters and report. Gor and Mkrtchyan have also incurred over $1 million in legal fees in Washington, D.C. that were necessary to mitigate the damage that Defendants did to Gor and Mkrtchyan's reputation in the District with the Ambassador and Embassy.

185.    Moreover, Defendants' and their co-conspirators' misconduct outlined in this Complaint made it unsafe for Mkrtchyan and his family to remain in Uzbekistan and forced them to leave the country, proximately causing further losses.

186.    Beyond the administrative and other costs that Mkrtchyan incurred to handle the logistics of relocating his family to a new country, Mkrtchyan and Gor have also incurred direct losses as a result of being forced to sell their assets, including real estate and other business interests in Uzbekistan, at a significant loss, or risk their seizure and expropriation. These losses amounted to at least $70 million.

187.    Thus far, Mkrtchyan and Gor have lost over $1 billion as a proximate result of Defendants' conduct, including but not limited to direct damages, losses from selling assets, shares, and real estate at a significant discount, significant remedial expenses, and lost profits from

existing and prospective contracts, lost accounts and investments, and the impairment or loss of long-term projects—as well as significant damage from the harm to their reputations.

188.    Because Defendants committed the tortious acts outlined in this Complaint accompanied by conduct and a state of mind evincing malice or its equivalent, an award of punitive damages is appropriate.

## CAUSES OF ACTION

### COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT
(All Defendants)

189.    Pleading affirmatively and in the alternative, Plaintiffs state the following claim, and incorporate the preceding and foregoing paragraphs, to the extent not inconsistent, as if fully set forth herein.

190.    Prior to Defendants' false statements in August 2024, Plaintiffs had valid and enforceable contracts with businesses in Uzbekistan and elsewhere, including but not limited to those identified in this Complaint.

191.    Defendants, through their long business relationships with Mkrtchyan and Gor and through further information provided by UCG to Straife and Fleming, knew of the existence of Plaintiffs' contracts before they made the false statements in August 2024.

192.    Defendants' false and defamatory statements—including false statements made to the Uzbek Ambassador in the Straife letter/report and Payne's letter—and related conduct were intended to and did in fact procure breaches, terminations, suspensions, and failures of performance of Plaintiffs' contracts, whether by the terms of the contracts or otherwise.

193.    Defendants' conduct was not privileged or legally justified.

194.    As a direct and proximate result of those breaches, terminations, suspensions, and failures of performance, Plaintiffs suffered substantial damages, including lost revenues and profits

under existing contracts, increased costs, and other pecuniary harm, in an amount to be proven at trial.

## COUNT II: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
### (All Defendants)

195.    Pleading affirmatively and in the alternative, Plaintiffs state the following claim, and incorporate the preceding and foregoing paragraphs, to the extent not inconsistent, as if fully set forth herein.

196.    Plaintiffs had ongoing, valid business relationships and business expectancies with existing commercial counterparties and investors in Uzbekistan and elsewhere, including, without limitation, anticipated follow-on contracts with the companies described in this Complaint. It was commercially reasonable for Plaintiffs to expect these relationships and expectancies to turn into further contractual relationships.

197.    Defendants had knowledge of these relationships and expectancies through information they received during their longstanding relationships with Plaintiffs and from information that Fleming and Straife received from UCG. Defendants used this information to target the specific government official—the Uzbek Ambassador in Washington, D.C.—whose action would result in the government intervening in those expectancies and prospective relationships as outlined in this Complaint.

198.    Defendants' false and defamatory statements to third parties—including false and defamatory statements made to the Uzbek Ambassador—intentionally interfered with Plaintiffs' business expectancies and relationships by falsely representing that Plaintiffs were engaged in criminal and wrongful activity, thereby causing the government: to have Plaintiffs' commercial counterparties/investors withhold, terminate, or refuse to enter into expected business relationships

and contracts with Plaintiffs, and to prevent Plaintiffs from entering into those expected business relationships and contracts.

199.    Defendants' conduct was not privileged or legally justified.

200.    Defendants' interference with Plaintiffs' prospective business advantages proximately caused Plaintiffs to lose substantial business opportunities, including the loss of expected contracts, investments, and profits, and caused additional pecuniary harm, in an amount to be proven at trial.

## COUNT III: DEFAMATION
### (All Defendants)

201.    Pleading affirmatively and in the alternative, Plaintiffs state the following claim, and incorporate the preceding and foregoing paragraphs, to the extent not inconsistent, as if fully set forth herein.

202.    Defendants published false statements of fact about Plaintiffs, including in the Straife letter/report and Payne's letter, sent to the Uzbek Ambassador and Uzbek President. Defendants also published, or worked with Shadmanov, UCG, and their agents to cause the publication of false statements of fact about Plaintiffs in online articles and other communications that repeated and amplified the same accusations to the Uzbek Ambassador and his staff in Washington, and other members of the business and diplomatic community, in part to make the letters and report seem more credible.

203.    These false statements included allegations that Plaintiffs were involved in the commission of criminal offenses.

204.    The false statements tended to injure Plaintiffs in their trade, profession, and community standing and lower them in the estimation of the community.

205.    Among other things, the false statements were defamatory per se in that they imputed the commission of criminal offenses—including but not limited to Plaintiffs' involvement in criminal conduct and organized crime—for which Plaintiffs may be indicted and punished or set forth false facts from which the commission of a crime could be inferred.

206.    Defendants published the false statements without privilege to third parties, including to the Uzbek Ambassador in Washington and his staff, the Uzbek President, and to others.

207.    Defendants published the false statements with knowledge of their falsity or reckless disregard for whether they were true, and did so with actual malice and the specific intent to harm Plaintiffs' reputations and business interests.  Alternatively, Plaintiffs are not public figures for any relevant purpose nor are the relevant matters at issue here matters of public concern, and Defendants acted at a minimum with negligence in publishing the false and defamatory statements at issue throughout this Complaint.

208.    Defendants' conduct was not privileged or legally justified.

209.    As a direct and proximate result of Defendants' false statements, Plaintiffs have suffered and continue to suffer substantial harm, including presumed general damages to their reputations as a matter of law because the statements are defamatory per se, as well as special damages in the form of lost contracts, lost business opportunities, lost profits, and other pecuniary and non-pecuniary losses, in an amount to be proven at trial.

### COUNT IV: INJURIOUS FALSEHOOD
(All Defendants)

210.    Pleading affirmatively and in the alternative, Plaintiffs state the following claim, and incorporate the preceding and foregoing paragraphs, to the extent not inconsistent, as if fully set forth herein.

211.    Defendants published false statements of fact about Plaintiffs' business and economic interests, including in the Straife letter/report and Payne's letter, asserting that Mkrtchyan participated in and Gor was a vehicle for criminal conduct, money laundering, corruption, and other criminal and disreputable conduct, and otherwise impugning the integrity and lawfulness of Plaintiffs' business operations and assets.

212.    Defendants published these false statements without privilege to third parties, including but not limited to the Uzbek Ambassador and Embassy in Washington, the President of Uzbekistan, and other government officials, investors, lenders, and business partners whose decisions directly affected Plaintiffs' contracts, projects, and property interests.

213.    Defendants published the false statements with knowledge of their falsity or with reckless disregard for their truth, and with malice toward Plaintiffs and an intent to damage Plaintiffs' business and economic interests.

214.    Defendants' conduct was not privileged or legally justified.

215.    As a direct and proximate result of Defendants' injurious falsehoods, Plaintiffs suffered special damages, including the loss of specific contracts, projects, and investment opportunities identified in this Complaint; lost profits; and other pecuniary losses, in an amount to be proven at trial.

## COUNT V: CONSPIRACY
### (All Defendants)

216.    Pleading affirmatively and in the alternative, Plaintiffs state the following claim, and incorporate the preceding and foregoing paragraphs, to the extent not inconsistent, as if fully set forth herein.

217.    Defendants Payne and Fleming agreed among themselves, and with others, including UCG, Shadmanov, their agents, and representatives of Straife, to make knowingly or

recklessly false and defamatory statements about Mkrtchyan and Gor to the Uzbek Ambassador, President of Uzbekistan, and others with the intent to cause harm to Mkrtchyan's and Gor's contractual relationships and expectancies and reputations, as outlined above—for their personal financial benefit and the ultimate financial benefit of Shadmanov and UCG, who gain from destroying Plaintiffs' business relationships and making an example of Plaintiffs. Defendants agreed to defame Mkrtchyan and Gor and acted with the specific intent to do so, in order to damage them.

218.    Defendants' actions pursuant to and in furtherance of that agreement—including the Straife letter/report and Payne's letter, and other knowingly false and defamatory statements published with the intent that they be read by the Uzbek Ambassador in Washington and ultimately the Uzbek President—were unlawful or undertaken in an unlawful manner.

219.    Defendants' conduct and that of their co-conspirators was not privileged or legally justified.

220.    Mkrtchyan and Gor were injured in their business and reputations as a proximate result of overt acts performed by the Defendants and others pursuant to and in furtherance of the common scheme, including through overt acts involved in sending the Straife letter/report and Payne's letter, and making other knowingly false and defamatory statements.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable and have tendered the jury fee.

## PRAYER FOR RELIEF

**NOW, THEREFORE**, Plaintiffs Mkrtchyan and Gor respectfully request judgment in their favor against Defendants, jointly and severally, awarding:

a.  all actual, compensatory, general, presumed, special, economic, exemplary, punitive, incidental, consequential, and other damages of any kind or character available by law,

including but not limited to lost profits, contracts, business opportunities, income, and goodwill;

b.  any pre-judgment and post-judgment interest;

c.  court costs and attorneys' fees, if applicable;

d.  such other and further relief, both at law and in equity, to which Plaintiffs are justly entitled.

March 12, 2026                                        Respectfully submitted,

                                                     */s/ Ryan P. Hartman*
                                                     **John B. Bellinger, III**
                                                     D.C. Bar 405059
                                                     john.bellinger@arnoldporter.com
                                                     **Ryan P. Hartman**
                                                     D.C. Bar 974807
                                                     ryan.hartman@arnoldporter.com
                                                     **Sally Pei**
                                                     D.C. Bar 1030194
                                                     sally.pei@arnoldporter.com
                                                     **Volodymyr Ponomarov**
                                                     D.C. Bar 90003758
                                                     volodymyr.ponomarov@arnoldporter.com

                                                     ARNOLD & PORTER KAYE SCHOLER LLP
                                                     601 Massachusetts Avenue, N.W.
                                                     Washington, D.C. 20001
                                                     Tel: (202) 942-5000
                                                     Fax: (202) 942-5999

                                                     *COUNSEL FOR PLAINTIFFS OVIK MKRTCHYAN AND GOR INVESTMENT LIMITED*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2026, the foregoing and all exhibits were served via the ECF system on all counsel of record.

                                                     /s/ Ryan P. Hartman
                                                     Ryan P. Hartman